Filed 7/27/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JAYDEN M., a Person Coming Under the Juvenile Court Law. | B321967 (Los Angeles County Super. Ct. No. 20LJJP00040D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOHANNA R., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Susan Ser, Judge. Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

When a child is removed from a parent in a juvenile dependency case, the court is required to order reunification services for the parent unless one of several statutory exceptions allowing for "bypass" applies. (Welf. & Inst. Code, § 361.5, subds. (a) & (b).)[1] As pertinent here, a juvenile court may bypass reunification services when (1) a juvenile court has previously terminated reunification or parental rights over a sibling or half sibling to the child in the current case, and (2) the parent has not subsequently made a "reasonable effort" to treat the problems that led to that previous termination of services or parental rights. (*Id.*, subds. (b)(10)(A) & (b)(11)(A).) But what is the appropriate starting point in time from which to gauge the reasonableness of the parent's effort? Is a court only to look to the parent's effort since the filing of the instant case, or may it look to the parent's effort (or lack thereof) since the sibling or half sibling was initially removed from the parent in the prior case where reunification services or parental rights were terminated? We hold that it is the latter. Applying this rule, the juvenile court properly examined the mother's minimal effort to address her drug addiction in the 20 years since a half sibling was

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

removed from her custody and reunification services were also terminated (rather than focusing solely on the mother's less inconsistent effort in the four months since this case was filed). We accordingly affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *Mother struggles with drug addiction since 2001, and loses custody of several of her children*

Johanna R. (mother) has seven children by several different fathers: Cynthia R. (born 1997), Damion R. (born 2001), Brianna R. (born 2003), Francisco R. (born 2004), Gael V. (birthdate unknown), Emma R. (born 2020), and—the child at issue in this case—Jayden M. (born 2021).

Prior to Jayden's birth, the juvenile court had exerted dependency jurisdiction over all but one of Jayden's six half siblings.[2]

Since the 2001 juvenile dependency case involving then-infant Damion, mother's drug use has been the underlying cause of the juvenile court's exertion of dependency jurisdiction over her children. Specifically, Damion was born with cocaine in his bloodstream in 2001; both mother and Brianna tested positive for cocaine when Brianna was born in 2003; and both mother and Emma tested positive for illegal narcotics when Emma was born in 2020—Emma, for amphetamine, and mother, for both amphetamine and opiates.

None of these cases ended with mother reuniting with the child. The juvenile court in Damion's case granted mother

---

[2] Gael was the subject of an investigation, but was apparently released to his father's care before any juvenile dependency petition was filed.

reunification services, but ultimately terminated those services as well as mother's parental rights over Damion. The juvenile court in Brianna's case terminated its jurisdiction by placing Brianna back in mother's custody, but three weeks later, mother "gave [Brianna] back" to the caregiver who had custody of Brianna during the years that case was open. The juvenile court in Emma's case also exerted dependency jurisdiction over then-16-year-old Francisco, but bypassed reunification services for both children and eventually terminated mother's parental rights over Emma (Francisco was placed in a legal guardianship). As of 2023, mother did not have custody over any of her children.[3]

During the two decades between 2001 and 2021, mother admitted to long periods of repeated use of illegal narcotics, and made only sporadic effort to address her drug addiction. Mother attended a drug rehabilitation program in 2003 as well as attended Narcotics Anonymous meetings and a class at an outpatient treatment center in 2020, but repeatedly relapsed into drug use and failed to comply with juvenile court orders to undergo drug treatment and participate in drug testing.

**B.** *Jayden is born*

In late 2020, mother became pregnant by Ramon F. (father), a 17-year-old working as a security guard for the liquor store mother regularly frequented. While pregnant, mother continued to use amphetamines, methamphetamines, and heroin.

_____

[3] Cynthia remained a dependent until she reached the age of 21 in 2018. Brianna's caregiver continued to care for Brianna since 2005 and was granted custody of Brianna in 2012; as of 2023, that caregiver was also caring for Emma and Jayden. Gael was apparently released to his father's care. And, as noted above, maternal grandmother became Francisco's legal guardian in 2021.

Mother gave social workers various reasons for why she relapsed into drug use while pregnant and claimed that she was taking Suboxone to help her stay off heroin, but both she and Jayden had opiates in their blood at the time of Jayden's birth in November 2021 and testing of Jayden's umbilical cord indicated he had also been exposed to morphine and amphetamines in utero. Jayden began suffering from withdrawal symptoms and was taken to the Neonatal Intensive Care Unit, where he remained for five weeks. Father was incarcerated in a juvenile detention center at the time Jayden was born and not released until Jayden was four months old.

## II. Procedural Background

### A. *A petition is filed to declare Jayden a dependent*

On November 19, 2021, the Los Angeles County Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert jurisdiction over Jayden on two grounds: (1) mother's drug use "endangere[d]" Jayden's "physical health and safety" and "place[d]" him "at serious risk of serious physical harm and damage," as evidenced by his positive toxicology screen at birth and mother's "extensive history" of drug abuse, which "render[ed]" her "incapable of providing regular care and supervision" (rendering jurisdiction appropriate under subdivision (b) of section 300); and (2) five of Jayden's older half siblings were or had been dependents of the juvenile court due to mother's substance abuse (rendering jurisdiction appropriate under subdivision (j) of section 300).[4]

---

[4] The petition also alleged that jurisdiction was proper under subdivision (b) of section 300 due to father's abuse of marijuana, and jurisdiction was sustained on this basis, but father has not appealed.

The petition further noted that the Department "may seek" an order that no reunification services be provided, under subdivision (b) of section 361.5.

**B.** *Mother makes intermittent effort to address her drug problem*

In mid-December 2021, mother applied to participate in an outpatient drug treatment program. When applying, mother admitted to using heroin "about 15 days out of the last 30 days," and a drug test on December 20, 2021 confirmed heroin use.

Mother began the three-month outpatient program in late December 2021. For the first two months, mother's participation was unsatisfactory. In January, mother's treatment counselor reported that mother was "not complying with the program" during its first two weeks; mother had arrived late for group sessions and would leave at the halfway mark; and mother had not started her drug testing. In February, mother was not participating appropriately in group sessions and was instead just "going through the motions," was not following the program's rules, was "exhausting" the counselors with a barrage of "excuses" and finger-pointing, and was endangering or distracting other attendees; mother was on the verge of being dropped from the program—or, at a minimum, denied permission to proceed to "phase two" of the program—because the counselors had "exhausted all their efforts" in trying to get mother to attend group sessions, follow the rules, and "keep the group a safe environment for the other attendees." The treatment center ultimately allowed mother to continue to phase two because that phase involved fewer and shorter sessions, so mother would place less of a burden on the staff. In "the last few weeks" of the program in March, mother's "attendance and participation"

6

improved dramatically and she "ma[de] great strides in staying committed to long term recovery."  Mother completed the program on April 4, 2022, with all negative drug tests from mid-January 2022 until her date of completion.

Mother had also attended six parenting classes by that time.

### C.      *Jurisdictional hearing*

On April 1, 2022, the juvenile court held the jurisdictional hearing, where it sustained all allegations against mother in the Department's petition.

### D.      *Dispositional hearing*

On May 2, 2022, the juvenile court held the dispositional hearing.

The court removed Jayden from mother's custody and also bypassed reunification services under subdivisions (b)(10) and (b)(11) of section 361.5.[5]  More specifically, the court found by clear and convincing evidence that bypass was proper under these provisions because (1) mother's reunification services or parental rights for Jayden's older half siblings had been terminated, and (2) mother's most recent four months of effort to address her drug addiction—while "commend[able]"—did not eliminate the court's "concern[s]" in light of her 20-year history of drug abuse problems and prior dependency cases.  The court also found that bypassing those services was in Jayden's best interest.

---

[5]      The Department had also argued that bypass was appropriate under subsection (b)(13) of section 361.5, but the record is conflicting as to whether the court bypassed reunification services under that provision.  Because we conclude that bypass was appropriate under subsections (b)(10) and (b)(11), we need not decide whether bypass would have also been proper under subsection (b)(13) of section 361.5.

Because the court was granting father six months of reunification services, however, the court told mother that if she showed "consistent consecutive clean tests" and "consistent visitation" by the next court date, such efforts "would be a good indicator" of mother's commitment to her sobriety, and thus may warrant revisiting its order bypassing reunification services under section 388.

### E.  *Appeal*

Mother filed this timely appeal.

## DISCUSSION

Mother's chief argument on appeal is that the juvenile court's order bypassing reunification services was not supported by the record.[6]

---

[6] Mother also argues that the juvenile court erred by not making "specific finding[s]" regarding "*why* [her] efforts to treat" her drug addiction "were not reasonable," although in her reply brief she asserts that she was merely noting the lack of explanation rather than seeking reversal on that basis. In any event, this argument lacks merit because specific findings are not required absent a statute so requiring (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1273; cf. *Yamada Brothers v. Agricultural Labor Relations Bd.* (1979) 99 Cal.App.3d 112, 123 [when statute "mandates a specific finding," "failure to make such a finding renders" the decision "fatally defective"]; *In re J.S.* (2011) 196 Cal.App.4th 1069, 1078 [same]), and subdivision (b) of section 361.5 does not so require (accord, *In re Jasmine C.* (1999) 70 Cal.App.4th 71, 76-77 [upholding juvenile court's bypass of reunification services even though it did not make specific findings that reunification would be detrimental to the minor]). Indeed, this subdivision's silence on this issue is both deafening and dispositive when contrasted with other subdivisions and statutes explicitly requiring juvenile courts to make specific findings to support other rulings in dependency proceedings.

8

A juvenile court is generally required to order reunification services for a parent "whenever a child is removed" from that parent's custody. (§ 361.5, subd. (a); *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474 (*Baby Boy H.*); *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 95-96 (*Cheryl P.*).) Our Legislature has, in certain statutorily enumerated situations, nevertheless granted juvenile courts discretion to decide whether reunification services are "in the best interest of the child." (§ 361.5, subds. (b) & (c)(2); *In re A.E.* (2019) 38 Cal.App.5th 1124, 1141.) These provisions are known as the ""bypass" provisions.'" (*In re G.L.* (2014) 222 Cal.App.4th 1153, 1163 (*G.L.*).) Consonant with the general presumption in favor of mandatory reunification services, the bypass provisions are "narrow in scope" and reach situations where "'the likelihood of reunification'" is "'so slim'" due to a parent's past failures that "expend[ing]" the Department's "'scarce'" resources on reunification services is likely to be "fruitless," or when "attempts to facilitate reunification" would otherwise not "serve and protect the child's interest." (*Baby Boy H.*, at pp. 474, 478; *Cheryl P.*, at p. 96; *In re Lana S.* (2012) 207 Cal.App.4th 94, 107 (*Lana S.*); *In re I.A.* (2019) 40 Cal.App.5th 19, 23 (*I.A.*); *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 196 (*Gabriel K.*); *Randi R. v. Superior Court* (1998) 64 Cal.App.4th

_____

(See, e.g., §§ 361.5, subd. (k) [requiring the court to specify the "factual findings used to determine that the provision of reunification services" to the parent "would not benefit the child" in the case of "severe sexual abuse"]; 361, subd. (e) [requiring the court to "state the facts on which the decision to remove the minor is based"]; 366.26, subd. (c)(1)(D) [if making a determination that the "termination of parental rights would be detrimental," the court "shall state its reasons" "on the record"]; *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 [same].)

9

67, 70 (*Randi R.*); *Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750 (*Deborah S.*).) By making the grant of reunification services discretionary in these situations, the bypass provisions aim to "focus reunification efforts" and resources on the cases "most likely to succeed" with reunification. (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 471.)

This case involves two bypass provisions. The first is subdivision (b)(10) of section 361.5, which provides that "[r]eunification services need not be provided to a parent" if the juvenile "court finds, by clear and convincing evidence," that (1) "the parent . . . failed to reunify with [a] sibling or half sibling" of the child now at issue and the juvenile court in the prior dependency case "ordered termination of reunification services," and (2) the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . from that parent." (§ 361.5, subd. (b)(10)(A).) The second is subdivision (b)(11) of section 361.5, which provides that "[r]eunification services need not be provided to a parent" if the juvenile court "finds, by clear and convincing evidence," that (1) the parent's "parental rights . . . over any sibling or half sibling" of the child now at issue "ha[ve] been permanently severed," and (2) the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . from the parent." (*Id.*, subd. (b)(11)(A).)[7]

_____

[7]  Under either provision, the order terminating reunification services or parental rights over the sibling or half sibling need not be "final"; entry of that order by the juvenile court is enough, even if the order still is subject to attack on appeal. (*In re T.G.* (2015) 242 Cal.App.4th 976, 987-988.)

When read as a whole, section 361.5 erects a two-step, burden-shifting procedure for bypassing reunification services under subdivisions (b)(10) and (b)(11).

In the first step, the Department bears the burden of proving by clear and convincing evidence that (1) the juvenile court had ordered termination of reunification services (under subdivision (b)(10)) or had severed parental rights (under subdivision (b)(11)) in a prior case involving a sibling or half sibling of the child in the current case;[8] (2) the "problem[] that led to the removal" of the sibling or half sibling is the same problem at issue in the current case, insofar as the problem involves the same "theme" even if it is not identical; and (3) the parent has "not subsequently made a reasonable effort to treat th[at] problem[]." (§ 361.5, subds. (b)(10)(A) & (b)(11)(A); *I.A.*, *supra*, 40 Cal.App.5th at pp. 23-24; *In re Albert T.* (2006) 144 Cal.App.4th 207, 217; *Cheryl P.*, *supra*, 139 Cal.App.4th at p. 96; *Lana S.*, *supra*, 207 Cal.App.4th at p. 108 ["recurrent theme" sufficient]; cf. *In re D.H.* (2014) 230 Cal.App.4th 807, 815-816

_____

[8] Although the text of these provisions specifies that the prior case involve a *sibling or half sibling* of the child in the current case, some—but not all—appellate courts have held that they also reach prior cases involving *the same child* as the one in the current case. (Compare *I.A.*, *supra*, 40 Cal.App.5th at pp. 26-27 [bypass provision applies when same child is subject of successive dependency cases involving same parent and same problem] and *Gabriel K.*, *supra*, 203 Cal.App.4th at p. 196 [same] with *J.A. v. Superior Court* (2013) 214 Cal.App.4th 279, 284 [bypass provision requires involvement of a sibling or half sibling; does not apply when same child involved in successive cases] and *In re B.L.* (2012) 204 Cal.App.4th 1111, 1115-1116 [same].) Because the prior cases here involve Jayden's half siblings, we need not weigh in on this split.

["problem" not "same" when one case involved substance abuse and another involved "unsafe and unhealthy [living] conditions"].)

In the second step, which presupposes the Department has carried its initial burden, the burden shifts to the parent to prove that it is in the child's best interest for the juvenile court to exercise its discretion to provide reunification services in this case. (*I.A.*, *supra*, 40 Cal.App.5th at p. 24; *Lana S.*, *supra*, 207 Cal.App.4th at p. 109.) In exercising this discretion, the court may consider a variety of factors relevant to the child's best interest, including (1) the parent's ""current efforts and fitness,"" (2) the parent's ""history,"" (3) the ""gravity of the problem"" that led to the assertion of dependency, (4) the "'strength of the bonds'" between the child and the parent and between the child and the current caregiver, and (5) the ""child's need for stability and continuity."" (*G.L.*, *supra*, 222 Cal.App.4th at p. 1164.) One factor that is essential—and hence necessary—to the assessment of a child's best interest is whether there is "'some "reasonable basis to conclude"'" that reunification is possible; if it is not, offering reunification services that are destined to fail is not in the child's best interest. (*Ibid.*)

We review a juvenile court's determination that the Department has carried its initial burden in the first step for substantial evidence. (*In re J.J.* (2022) 81 Cal.App.5th 447, 455; *In re Harmony B.* (2005) 125 Cal.App.4th 831, 839-840 (*Harmony B.*).) In so doing, we ask whether there is sufficient evidence in the record that is reasonable, credible and of solid value—when viewed in the light most favorable to the juvenile court's determination—for a reasonable trier of fact to conclude that the Department carried its burden by clear and convincing evidence.

(*Harmony B.*, at pp. 839-840; *G.L.*, *supra*, 222 Cal.App.4th at p. 1164; *In re V.L.* (2020) 54 Cal.App.5th 147, 154-155; see generally, *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1004-1005.) We review a juvenile court's assessment of what is in the child's best interest for an abuse of discretion. (*Baby Boy H.*, *supra*, 63 Cal.App.4th at p. 474.)

Mother does not dispute that the juvenile court had previously terminated reunification services and parental rights over several of Jayden's half siblings or that those prior cases involved the same problem—namely, mother's drug addiction—that underlies Jayden's dependency proceeding. Because mother also does not contest the juvenile court's analysis of what is in Jayden's best interest, the propriety of the juvenile court's order bypassing reunification services in this case turns on whether the court's finding that mother did not make a reasonable effort to address her drug addiction is supported by substantial evidence. Mother insists that she "made significant and very reasonable efforts to treat her substance abuse problem," and for support points solely to the efforts she made in the four months since the Department filed its petition in this case. This appeal therefore presents two questions. The first is legal—namely, should a juvenile court in assessing a parent's reasonable efforts under subdivisions (b)(10) and (b)(11) of section 361.5 focus solely on the time since the current case was filed? Because this question is one of statutory interpretation, our review is de novo. (*In re Brianna S.* (2021) 60 Cal.App.5th 303, 311 (*Brianna S.*); *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1059.) The second is factual—namely, was the juvenile court's finding of no reasonable effort supported by substantial evidence?

13

**I. How Far Back May a Juvenile Court Look in Assessing Whether a Parent Has Made a "Reasonable Effort" to Solve the Problem?**

We hold that, in assessing whether a parent made a reasonable effort to address a problem from a prior dependency case involving the current child's sibling or half sibling and where reunification services or parental rights were terminated under subdivisions (b)(10) or (b)(11) of section 361.5, the juvenile court should consider the entire time span between, at the one end, the earliest time a sibling or half sibling was removed from the parent's custody due to that problem and, at the other end, the dispositional hearing in the current case. This holding rests on three grounds.

First, this holding is dictated by the plain text of subdivisions (b)(10) and (b)(11) of section 361.5, and the plain text of a statute is typically dispositive. (See *Brianna S.*, *supra*, 60 Cal.App.5th at p. 313; *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 ["the plain meaning of the language governs"].) Both subdivisions specify that the court is to assess whether the parent has "*subsequently* made a reasonable effort to treat the problems *that led to removal* of the sibling or half sibling." (§ 361.5, subds. (b)(10)(A) & (b)(11)(A), italics added.) The italicized language unambiguously establishes that the reasonableness of the parent's effort is to be measured from the point at which the first sibling or half sibling is removed for the same reasons that underlie the current case.[9]

_____

[9] Because there are two decades between Damion's removal from mother's custody in 2001 due to her drug abuse and Jayden's dispositional hearing in 2022, this case does not present the question of what a juvenile court should do when there is no

14

Second, this holding is consistent with a uniform wall of precedent. Every published decision we have found evaluates the reasonableness of a parent's effort going back to the time of the removal of the first sibling or half sibling; none has limited a juvenile court's inquiry to the period following the filing of the petition in the current case. (E.g., *Harmony B.*, *supra*, 125 Cal.App.4th at p. 842 [court should consider the parent's efforts "toward correcting the underlying problems" "in the meantime" between the prior and current cases]; *Cheryl P.*, *supra*, 139 Cal.App.4th at p. 97 [same]; *Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1117-1118, 1123-1124 (*Jennifer S.*) [considering parent's entire history between the initial removal of the older siblings in 2006 and the subsequent removal of the younger sibling in 2017]; *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464 (*Renee J.*) [court could have "focused on the fact that [mother] had made significant changes in her lifestyle since the removal of her other children"]; *R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 915 (*R.T.*) [considering events "in . . . totality" between the termination of parental rights over older sibling in 2006 and younger sibling's second removal in

gap in time between the termination of the reunification services or parental rights over the sibling or half sibling, and the dispositional hearing in the current case. The appellate courts are divided over how to proceed where there is no time gap. (Compare *Harmony B.*, *supra*, 125 Cal.App.4th at pp. 842-843 [court may consider events occurring only after termination in sibling or half sibling's case, such that there will be no opportunity for the parent to make "reasonable efforts"] with *Cheryl P.*, *supra*, 139 Cal.App.4th at p. 98-99 [court should consider parent's "reasonable efforts made since *the removal* of the sibling"], italics added.)

15

2011]; *Gabriel K.*, *supra*, 203 Cal.App.4th at pp. 196-197 [considering events between minor's first removal in 2007 and the subsequent removal of him and his younger sibling in 2011].)

Third, this holding is consistent with the public policy animating the bypass provisions. As alluded to above, the bypass provisions seek to balance two competing policies: On the one hand, the bypass provisions grant a juvenile court the discretion to bypass services as a means of reserving a social service agency's finite resources for those cases where reunification is likely rather than "fruitless" (*Cheryl P.*, *supra*, 139 Cal.App.4th at p. 96; *I.A.*, *supra*, 40 Cal.App.5th at p. 23; *Gabriel K.*, *supra*, 203 Cal.App.4th at p. 196; *Baby Boy H.*, *supra*, 63 Cal.App.4th at p. 478; *Randi R.*, *supra*, 64 Cal.App.4th at p. 70; *Deborah S.*, *supra*, 43 Cal.App.4th at p. 750), and thus as a means of avoiding the "tragedy" of "delay[ing] permanency for [a] dependent child" in such circumstances (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1127); on the other hand, the provisions seek not to be too "harsh" by making this discretion available only if the parent has made no reasonable effort to address the problem at issue (*Harmony B.*, *supra*, 125 Cal.App.4th at p. 842). The bypass provisions try to walk that line by granting parents who have made a reasonable effort a further opportunity to reunify, while denying parents who have "failed to address" longstanding problems yet "another opportunity to do so." (*Id.* at p. 843; *Randi R.*, at p. 73.) The best way to walk this line and calibrate this balance of competing policies is to allow courts to look at the parent's *full* relevant history. This broader focus in one way gives a parent's efforts in the current case short shrift, but the dependency law framework already provides a parent with the opportunity to bolster the current efforts: If those efforts are commendable but too short-

16

term at the time of the dispositional hearing for the juvenile court to conclude they are "reasonable" when viewed through the prism of the *total* relevant time period, the parent can always seek to modify the bypass order and obtain an order granting reunification services by filing a petition under section 388. (§ 388, subd. (a)(1); *In re L.S.* (2014) 230 Cal.App.4th 1183, 1194.)

## II. Substantial Evidence Supports Bypass

When, as we have concluded is proper, mother's effort to treat her drug addiction is viewed starting from the time of Damion's removal from her custody in 2001 due to that addiction through the dispositional hearing for Jayden in 2022, substantial evidence supports the juvenile court's finding that her effort was not "reasonable."

A "reasonable effort to treat" a problem means just that.[10] The question is not whether the parent has ""cure[d]""" or "'abolished'" the problem (*Cheryl P.*, *supra*, 139 Cal.App.4th at p. 97; *Renee J.*, *supra*, 96 Cal.App.4th at p. 1464; *K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, 1393 (*K.C.*)), or whether the parent has "attained" a "'certain level of progress'" (*R.T.*, *supra*, 202 Cal.App.4th at p. 914). Instead, the focus is on the parent's

---

**10** *Renee J.* seemed to articulate a different test, which is more difficult to meet, when it suggested that bypass is inappropriate unless the Department shows that "further efforts [by the parent] to deal with the problem would" be "'fruitless'" and admitted that this would be a "pretty high standard." (*Renee J.*, *supra*, 96 Cal.App.4th at p. 1464.) We agree with *Cheryl P.* that the bypass provisions "do[] *not* impose a 'fruitless' standard" (*Cheryl P.*, *supra*, 139 Cal.App.4th at p. 97) and reject *Renee J.* to the extent that it adopted "fruitless" as the standard for the parent's efforts (rather than merely articulating the policy underpinning that standard).

17

*effort.* It is not enough to show "any" effort, even a genuine one. (*Ibid.*) "[L]ackadaisical or half-hearted efforts" will also not do. (*Cheryl P.*, at p. 99; *K.C.*, at p. 1393.) Instead, the effort must be *reasonable*, and reasonableness is assessed by looking to (1) the duration of the parent's effort, (2) the "extent and context" of the parent's effort, and (3) other factors related to the "quality and quantity of those efforts." (*R.T.*, at p. 914, italics omitted.) The parent's progress, or lack thereof, "both in the short and long term"—while not dispositive—is nevertheless relevant "to the extent it bears on the *reasonableness* of the effort made." (*Ibid.*)

It is undisputed that mother made *some* effort to address her longstanding drug abuse problem, at least after the petition involving Jayden was filed: She completed a drug treatment program, attended six parenting classes, and "tested negative for all substances" from mid-January through the beginning of April 2022. But substantial evidence supports the juvenile court's finding that this effort was not reasonable against the backdrop of her entire drug history dating back to the removal of Damion from her custody in 2001. As a threshold matter, mother's effort since the filing of this case—while a commendable start—was not wholehearted: Mother struggled to attend her drug treatment sessions consistently and to participate fully, so much so that the treatment center considered discharging her from the program multiple times for being disruptive to the other participants; mother's "attendance and participation" was "[a]bove [s]atisfactory" only "in the last few weeks" of the program; and she only started "making great strides in staying committed to long term recovery and being compliant with all her requirements" in those final few weeks. More significantly, however, mother's four months of uneven effort is a drop in the

18

bucket when viewed in the larger context of a 20-year history of serious and consistent drug abuse. Against this backdrop, the juvenile court had ample grounds to find that mother's recent effort to treat her drug addiction was not "reasonable." (See, e.g., *Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1124 [in the context of a "long-term substance abuse issue" lasting for "years," father's "minimal efforts" in substance abuse treatment "mere weeks" before a hearing were "not a reasonable effort to treat th[e] problem for purposes of a section 361.5, subdivision (b)(10) bypass"]; *R.T.*, *supra*, 202 Cal.App.4th at p. 915 [upholding bypass under subsections (b)(10) and (b)(11) because there was "no evidence in the record that mother, in the month or two of services" provided after second removal, "had engaged in th[e] services in any meaningful way"]; *Randi R.*, *supra*, 64 Cal.App.4th at p. 73 [upholding bypass and stating that child's future "should not be sacrificed" to give a parent "another chance to try to get and stay sober"].) The juvenile court's finding is further supported by evidence that mother has repeatedly relapsed after treatment and/or periods of sobriety in the past. This finding is consistent with the conventional wisdom and practical reality that short and recent periods of sobriety are often not enough to counter a longstanding pattern of use and relapse. (See, e.g., *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423-424 [200 days insufficient to convince juvenile court that a relapse would not occur]; *In re Amber M.* (2002) 103 Cal.App.4th 681, 686-687 [relapse following 300 days of sobriety].) Thus, substantial evidence supports the juvenile court's finding that the effort underlying mother's brief period of sobriety after decades of drug abuse is not "reasonable."

Mother resists this conclusion, minimizing her drug use and urging us to accept her proffered reasons for her minimal effort to combat her addiction:  She attributes her February 2021 relapse to her father's death (even though she also attributed her relapse before Emma's birth in 2020 to her father's death), brushes aside her relapse only two weeks before Jayden's birth by saying that she "attempted, albeit unsuccessfully, to enroll" in treatment, and downplays the extent to which she failed to fully engage with the treatment program by saying merely that she "struggled at times."  In doing so, mother asks us to ignore the governing standard of review and reevaluate the evidence in the light most favorable to her, which we may not do.  (*In re R.T.* (2017) 3 Cal.5th 622, 633 [we "'review the record in the light most favorable to the court's determinations'" and leave "'issues of fact and credibility'" to the trial court]); *G.L.*, *supra*, 222 Cal.App.4th at p. 1164 [we "presume 'in favor of the order, consider[] the evidence in the light most favorable" to the order, and "'resolv[e] all conflicts in support of the order'"].)

## DISPOSITION

The juvenile court's order is affirmed.

**CERTIFIED FOR PUBLICATION.**

_____, J.

HOFFSTADT

We concur:

_____, Acting P. J.

ASHMANN-GERST

_____, J.

CHAVEZ

21